UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Judith Redden,
    Claimant

    v.                              Civil No. 08-cv-314-SM
                                    Opinion No. 2009 DNH 076
Michael Astrue, Commissioner,
Social Security Administration,
    Respondent

## **O R D E R**

Pursuant to 42 U.S.C. § 405(g), Judith Redden moves to reverse the Commissioner's decision that she was not disabled, and therefore not eligible for Social Security disability insurance benefits, from September 11, 2003, through December 31, 2004. The Commissioner, in turn, moves for an order affirming his decision. For the reasons given below, the matter is remanded to the Administrative Law Judge ("ALJ") for further proceedings consistent with this opinion.

### **Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of
social security disability benefits unless 'the [Commissioner]
has committed a legal or factual error in evaluating a particular
claim.' "  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st
Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885
(1989)).

As for the statutory requirement that the Commissioner's
findings of fact be supported by substantial evidence, "[t]he
substantial evidence test applies not only to findings of basic
evidentiary facts, but also to inferences and conclusions drawn
from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-
18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730
(2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than
[a] mere scintilla.  It means such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion.' "  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st
Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401
(1971)).  Finally, when determining whether a decision of the
Commissioner is supported by substantial evidence, the court must
"review[ ] the evidence in the record as a whole."  Irlanda Ortiz

2

<u>v. Sec'y of HHS</u>, 955 F.2d 765, 769 (1st Cir. 1991) (quoting

<u>Rodriguez v. Sec'y of HHS</u>, 647 F.2d 218, 222 (1st Cir. 1981)).[1]

## Background

The parties have submitted a Joint Statement of Material

Facts (document no. 10).  That statement is part of the court's

record and will be summarized here to the extent necessary to

provide context for this decision.

Redden started working for Osram Sylvania in the mid 1970s,

and worked there until September 10, 2003.  Her employment ended

under circumstances described in an October 8, 2003, letter to

Redden from Osram Sylvania's Human Resources Manager:

> [T]his letter is sent to you to confirm that Human
> Resources sent you home from work on September 10, 2003
> due to a reaction from your pain medication.
>
> At that time, you were instructed not to report to work
> because we were concerned about you[r] safety and we
> discussed that you should be seen by a physician and
> your medication reviewed.  You have remained out of
> work since that time per doctor's notes.

---

[1] "It is the responsibility of the [Commissioner] to
determine issues of credibility and to draw inferences from the
record evidence.  Indeed, the resolution of conflicts in the
evidence is for the [Commissioner], not the courts."  <u>Irlanda
Ortiz</u>, 955 F.2d at 769 (citations omitted).  Moreover, the court
"must uphold the [Commissioner's] conclusion, even if the record
arguably could justify a different conclusion, so long as it is
supported by substantial evidence."  <u>Tsarelka v. Sec'y of HHS</u>,
842 F.2d 529, 535 (1st Cir. 1988).

(Administrative Transcript (hereinafter "Tr.") at 502.)  Redden never returned to work.

Two days before her claimed onset date of September 11, 2003, Redden was referred by Dr. Andrew Forest to Interventional Spine Medicine ("ISM"), a pain clinic (Tr. at 476).  Between September 11, 2003, and January 1, 2005, the onset date determined by the ALJ, Redden visited ISM at least twelve times. (Tr. at 479-97.)  During that same fifteen-month span, she made at least eight visits to Seacoast Area Physiatry ("SAP") (Tr. at 266-84, 641-45), had more than seventy treatments from a chiropractor (Tr. at 573-84), and underwent a course of physical therapy (343-54).

By September 24, 2003, ISM's Dr. Asi Hacobian had diagnosed Redden with "chronic neck pain" and "cervical facet arthropathy."[2]  (Tr. at 479)  Thereafter, Dr. Hacobian provided Redden with five fluoroscopically guided cervical facet joint nerve blocks and three fluoroscopically guided radiofrequency lesion treatments of the cervical facet joints.[3]  On November 6,

_____

[2] "Arthropathy" is defined as "[a]ny disorder affecting a joint."  STEADMAN'S MEDICAL DICTIONARY 150 (27th ed. 2000).

[3] Redden received nerve blocks in September, October, and November of 2003, and October of 2004 (Tr. at 479-81, 485, 493), and received cervical facet lesion treatments in December of 2003, and January and November of 2004 (Tr. at 486, 487 494).

2003, Dr. Hacobian wrote: "pt to be off work for 3 wks, then reevaluate and decide if she is ready to return to work." (Tr. at 484.) On January 19, 2004, he wrote that she could return to work part time, for four hours a day, three days a week, with various restrictions. (Tr. at 488.) Every office visit form from ISM reports that Redden was taking Darvocet.

Redden had her first consultation with SAP during the disputed time period on March 8, 2004.[4] (Tr. at 266.) She complained of bilateral shoulder pain and neck pain. (Id.) According to the report of her initial consultation:

> Since September, [Redden] has been followed by Interventional Spine Medicine. They did nerve blocks, short lasting, which gave her good benefit, and then radiofrequency ablation. Since that time, she has had partial, but not full, improvement. She says that she has fewer flares than she used to, and has even had a day or two when her pain was down to zero. However, due to persistent daily pain in her neck, shoulders, and even some in the back, she is referred back to our practice. Her pain averages a fairly constant 7/10, rarely goes beyond this, and can go as low as zero.

(Tr. at 266.) That report includes the following impression:

> 1. Bilateral shoulder impingement, left greater than right.
>
> 2. Cervical and shoulder girdle myofascial pain syndrome, with differential diagnosis possibly

---

[4] She had previously received treatment from SAP between June of 2001 and May of 2002. (Tr. at 204–64.)

including cervical instability, although this is
unlikely.  The patient also appears to have mild
thoracic outlet syndrome, most likely on the basis
of postural deficit bilaterally.

3.    Chronic pain.

(Tr. at 268.)  Under the heading "Plan," the March 8 SAP report

includes the following relevant entries:

1.    She has tried numerous NSAIDs,[5] including, but not
limited to, Mobic, Relafen, Bextra, Celebrex and
Naproxen.  She has tried Nortriptyline and
Flexeril, also without benefit.  She has never
tried Oruvail, and a prescription is provided for
200 mg #30 one QD, with one refill. . . .

2.    She is not on a muscle relaxant, and a limited
prescription is provided for Soma 350 mg #30 up to
one TID, without refill. . . .

3.    Continue use of Darvocet.  She currently has this
prescribed through Interventional Spine Medicine.
We will see if she needs a refill at next visit.

4.    Strongly recommend cortisone injection to left
shoulder subacromial space.

. . . .

8.    She does have a work capacity, four hours a day,
three days a week . . . .

(Tr. at 268-69.)  Redden received at least one cortisone

injection from SAP.  (Tr. at 273-74.)  In a Workers' Compensation

Form dated March 15, 2004, SAP's Stefanie Diamond, PA-C, reported

that Redden had reached maximum medical improvement, and that she

---

[5] "NSAID" is an abbreviation for "nonsteroidal anti-
inflammatory drugs."  STEADMAN'S, supra note 2, at 1231.

6

was able to work a maximum of four hours per day and a maximum of
three days per week.[6]  (Tr. at 275.)

In a note dated May 26, 2004, Diamond reported: "I have told
Judith that she continues to be at maximum medical improvement
and I anticipate that she will have episodic flare ups of neck
and shoulder girdle pain.  I don't know that we have much else to
offer her other than medication and continued independent
exercise and p.r.n. RFA."  (Tr. at 276.)

A follow-up consultation note from SAP, dated July 28, 2004,
reports:

> She is currently on glucosamine, and has been taking
> MSM over the last four weeks, which she does not feel
> has helped a great deal . . . .  She takes a constant
> dose of 3-4 Darvocet per day, which is the only thing
> that has really helped her.  She discontinued
> Flurbiprofen, and was started on Naprosyn by her PCP
> for her left hip issue.  She is not clear whether this
> really helps either.  Other medications include Zoloft,
> Prilosec, Synthroid.
>
> Over the course of the last 3 years, [Redden] has had
> extensive treatment and workup.  She has tried a TENS
> unit, without much benefit, and has been on multiple
> non-steroidal anti-inflammatories, including Celebrex,
> Bextra, Mobic, Relafen and others.  She has been on
> multiple muscle relaxants, per her report, including
> Zanaflex (Tizanidine), Baclofen, Flexeril, Skelaxin,

---

[6] In two subsequent Workers' Compensation Forms completed at
SAP in April and May, neither Dr. Bruce Myers (April) nor Diamond
(May) responded to the question asking them how many hours per
day and days per week Redden was able to work.  (Tr. at 279-80.)

all of which have been ineffective.  She has tried
Nortriptyline in the past.  She was recently tried on
Amitriptyline by Dr. Myers, but this caused excessive
AM drowsiness . . . [and] she did not really experience
any appreciable benefit from the medication.

She has had multiple trigger point injections, and has
had more sophisticated injections, including
radiofrequency ablation, which did yield some benefit.
. . .

. . . .

**IMPRESSION/PLAN:** As noted above, chronic cervical and
shoulder girdle myofascial pain syndrome, with shoulder
impingement.  I do believe, as other providers have
stated, that she is at maximum medical improvement. . .
.  I have discussed with her that I am somewhat
uncomfortable with chronic use of Darvocet.

(Tr. at 281-82.)


   After a flare-up in her symptoms, Redden returned to SAP in

October of 2004, for a follow-up consultation.  The resulting

note contains the following relevant entries:

Given her worsening symptoms, she has contacted
Interventional Spine Medicine, and was scheduled for
radiofrequency ablation 10/25/04 with Dr. Hacobian.
She has increased her Darvocet from the usual three per
day up to between 5-6 per day in the last couple of
weeks, because of her worsening symptoms.  She also
continues on Zoloft, Prilosec and Synthroid.

In the past, as has been mentioned previously, she has
had multiple medications, including OxyContin, which
chose not to take, due to her concern about that
particular medication, Soma, Flexeril, Tizanidine,
Ultram, non-steroidal anti-inflammatories, including
Celebrex, Bextra, Mobic, Relafen, Nortriptyline and
Amitriptyline.  TENS unit was not beneficial for her.
She was put on one other pain patch, which I believe

was a Duragesic patch, but she did not tolerate it. . .
.

. . . .

**IMPRESSION/PLAN:** . . . Again, I feel that she is at
maximum medical improvement, and it is not clear to me
that there is a lot more for us to offer her.  She had
mentioned these issues to Dr. Hacobian, and apparently
the possibility of starting Avinza was discussed.  This
may be a good choice, although, as I had mentioned at
her last visit, I am uncomfortable starting her on a
long acting narcotic medication at this point. . . .  I
will offer her samples of Lidoderm transdermal patches,
to see if this is beneficial.  Given her chronic use of
Darvocet, will obtain liver function testing, to be
sure that no liver injury is occurring with exposure to
Tylenol.

(Tr. at 641-42.)


        Finally, in a note resulting from an office visit to SAP on

November 15, 2004, Dr. Myers noted that Redden was taking four

Darvocet a day for pain, and provided the following impression:

        Persistent bilateral upper quarter pain and neck pain
        related to both diagnoses.  She is at maximum medical
        improvement.  She may go through the RFA with Dr.
        Hacobian but for the most part I do not think she is
        going to improve anymore than she has.  She is aware
        that she is going to have to live with pain.

(Tr. at 643.)  He then made the following relevant

recommendations:

        1.    I have recommended some changes in her
              medications.  As she has had some elevation in
              LFTs she will discontinue the Darvocet and restart
              propoxyphene 100 mg 3-4 a day.

2.   Try increasing her Zoloft to 75-1- mg to help with
     the pain.

3.   Begin Skelaxis 400-800 mg up to 4 times a day for
     muscle pain.  She does not have to take this every
     day, she can take it on a p.r.n. basis.

(Id.)

Redden applied for disability insurance benefits on April 7,
2004, claiming repetitive motion injuries and pain resulting from
left rotator cuff surgery, and claiming an onset date of
September 11, 2003.  Her claim was denied initially, and after a
hearing before an ALJ.  Redden took her claim to the Appeals
Council, which remanded her case to the ALJ.

Upon rehearing, the ALJ made the following relevant finding:
"During the period from September 11, 2003 through December 31,
2004, considering the claimant's age, education, work experience,
and residual functional capacity [for a range of light-exertion
work activity], there were a significant number of jobs in the
national economy that the claimant could have performed."  (Tr.
at 34.)  On that basis, the ALJ determined that Redden was not
under a disability from September 11, 2003, through December 31,
2004.  (Tr. at 35.)  In determining Redden's residual functional
capacity ("RFC"), the ALJ considered her symptoms, including
pain, and determined that "the claimant's medically determinable

10

impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible prior to January 1, 2005."  (Tr. at 31.) The ALJ elaborated:

> A review of the medical evidence of record reveals evidence of an extended history of treatment for neck and shoulder pain related to repetitive work activities.  Her records indicate a diagnosis of bilateral shoulder impingement and a cervical/shoulder girdle myofascial pain syndrome. . . .
>
> A review of the claimant's medical records, compiled during the period from November of 2002, when she underwent her functional capacity evaluation, through December 31, 2004, fails to reveal any evidence of a significant change in her overall condition which would further limit her assessed functional capacity.  During this period, the claimant continued to receive treatment for chronic pain in her neck and shoulders. While continuing to note some fluctuating levels of pain, her records reveal evidence of a gradual improvement with treatment. . . .  By April of 2004, she rated her pain at a level of 3 out of 10 at worst, an improvement from a prior rating of 6 out of 10.

(Tr. at 31–32.)

## Discussion

According to Redden, the ALJ's decision should be reversed, and the case remanded, because the ALJ incorrectly determined her onset date by erroneously determining that her subjective complaints of pain were not credible and by making a residual

functional capacity assessment that was not supported by substantial evidence in the record.

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The issue in this case is whether the ALJ correctly determined that claimant was not under a disability between September 11, 2003, and December 31, 2004.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage
> in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment
> which can be expected to result in death or which has
> lasted or can be expected to last for a continuous
> period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a
> disability only if [her] physical or mental impairment
> or impairments are of such severity that [she] is not
> only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> [she] lives, or whether a specific job vacancy exists
> for [her], or whether [she] would be hired if [she]

applied for work.  For purposes of the preceding
sentence (with respect to any individual), "work which
exists in the national economy" means work which exists
in significant numbers either in the region where such
individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

In order to determine whether a claimant is disabled for the

purpose of determining eligibility for disability insurance

benefits, an ALJ is required to employ a five-step process.  <u>See</u>

20 U.S.C. §§ 404.1520.

The steps are: 1) if the [claimant] is engaged in
substantial gainful work activity, the application is
denied; 2) if the [claimant] does not have, or has not
had within the relevant time period, a severe
impairment or combination of impairments, the
application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform past
relevant work, then the application is denied; 5) if
the [claimant], given his or her residual functional
capacity, education, work experience, and age, is
unable to do any other work, the application is
granted.

<u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920, which outlines the same five-step process as

the one prescribed in 20 C.F.R. § 1520).

The claimant bears the burden of proving that she is

disabled.  <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 (1987).  She

13

must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982))  Finally,

> In assessing a disability claim, the [Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witness; and (3) the plaintiff's educational background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d 5, 6 (1st Cir. 1982)).

Claimant's principal argument is that the ALJ failed to properly assess her subjective claim of disabling pain under the requirements set out in Avery, 20 C.F.R. § 404.1529, and Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (S.S.A.).

According to SSR 96-7p, "an individual's statement(s) about his or her symptoms[7] is not in itself enough to establish the existence of a physical or mental impairment or that the individual is disabled."  1996 WL 374186, at *2.  When "symptoms, such as pain, fatigue, shortness of breath, weakness, or

---

[7] "A symptom is an individual's own description of his or her physical or mental impairment(s)."  SSR 96-7p, 1996 WL 374186, at *2.

nervousness," id., are alleged, SSR 96-7p prescribes a two-step evaluation process:

> * First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the individual's pain or other symptoms. . . . If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.
> * Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

Id.  In addition:

> When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of

15

evidence, including the factors below, that the
adjudicator must consider in addition to the objective
medical evidence when assessing the credibility of an
individual's statements:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and
> intensity of the individual's pain or other
> symptoms;
>
> 3. Factors that precipitate and aggravate the
> symptoms;
>
> 4. The type, dosage, effectiveness, and side
> effects of any medication the individual takes or
> has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the
> individual receives or has received for relief of
> pain or other symptoms;
>
> 6. Any measures other than treatment the
> individual uses or has used to relieve pain or
> other symptoms (e.g., lying flat on his or her
> back, standing for 15 to 20 minutes every hour, or
> sleeping on a board); and
>
> 7. Any other factors concerning the individual's
> functional limitations and restrictions due to
> pain or other symptoms.

Id. at *3.


    Here, the ALJ did determine that there was an underlying

medically determinable physical impairment that could reasonably

be expected to produce Redden's pain (Tr. at 31), thus completing

the first step of the SSR 96-7p evaluation process.  Difficulties

arise, however, at the second step.  For one thing, the ALJ

appears to have made a credibility assessment, and a negative

16

one, without first determining that Redden's "statements about
the intensity, persistence, or functionally limiting effects of
[her] pain . . . [were] not substantiated by objective medical
evidence."  SSR 96-7p, 1996 WL 374186, at *2.  The record in this
case appears to be replete with objective medical evidence
substantiating Redden's statements about the intensity,
persistence, and functionally limiting effects of her neck and
shoulder pain.  Upon being referred to the ISM pain clinic,
Redden was diagnosed with "chronic neck pain."  (Tr. at 479.)
Upon being referred to SAP, Redden was diagnosed with "cervical
myofascial pain superimposed upon cervical sprain/strain."  (Tr.
at 271.)  Those were not Redden's subjective complaints; they are
medical diagnoses.  Thus, it is not clear that the ALJ was even
obligated to make a credibility determination.

But, assuming it was necessary to assess Redden's
credibility, the ALJ's credibility determination is not supported
by substantial evidence.  The ALJ's decision makes passing
reference to Redden's "extended history of treatment for neck and
shoulder pain," (Tr. at 31), but gives scant attention to the
records generated by that extensive treatment.  The ALJ
specifically mentions one treatment note, two MRIs, and two
statements Redden made to her physical therapist.  (Tr. at 32.)
But, as noted above, during the disputed time period, Redden's

17

efforts to achieve relief from her pain included a dozen visits to ISM, eight visits to PAP, multiple visits to a physical therapist, and more than seventy visits to a chiropractor, plus workouts at a gym. The ALJ's decision does not acknowledge the range of professionals Redden saw in search of pain relief, much less the large number of visits she made to those professionals.

Moreover, the ALJ's statement that Redden's medical records "reveal evidence of a gradual improvement with treatment" (Tr. at 32) is not supported by substantial evidence. That finding is based upon an April 2, 2004, treatment plan and progress report from Redden's physical therapist who noted that Redden initially presented on February 17 with "constant pain 6/10" (Tr. at 354) but reported, on April 2 that "her pain [was] @ a level of 3/10 @ worst" (id.). The medical records include many more pain metrics, including, at a minimum, these: (1) 5/10, reported to ISM on November 6, 2003 (Tr. at 481); (2) 3/10, reported to ISM on November 20 (Tr. at 485); (3) 6-7/10, reported to chiropractor Russell B. Grazier on February 27, 2004 (Tr. at 573); (4) 7/10, reported to SAP on March 8 (Tr. at 266); (5) 3/10, reported to SAP on April 13 (Tr. at 271); (6) 5-6/10, reported to SAP on May 26 (Tr. at 276); (7) 6-7/10, reported to Dr. Grazier on June 4 (Tr. at 575); (8) 5-6/10, reported to SAP on July 28 (Tr. at 281); (9) 5/10, reported to ISM on October 12 (Tr. at 491); and

18

(10) 6/10, reported to ISM on December 21, 2004 (Tr. at 496).[8]
Those pain reports, viewed in context, do not constitute
substantial evidence supporting a finding that Redden's pain
symptoms were on a path of "gradual improvement" between
September 11, 2003, and December 31, 2004.  That finding is
further undercut by multiple statements from treating sources,
entirely unacknowledged by the ALJ, that Redden had reached
maximum medical improvement.  To take one example, on July 28,
2004, three months after the 3/10 pain report discussed by the
ALJ, Redden reported pain at a level of 5-6 out of 10 to SAP's
Peter Attenborough, PA-C, who, in the note containing Redden's

---

[8] Given those ten pain metrics from the records of Redden's
pain clinic, her physiatrist, and her chiropractor – none of whom
were mentioned in the ALJ's decision – it is not accurate to
state, as the Commissioner does in his brief, that claimant's
"reported complaints of pain and varying intensity levels to her
treating sources were also chronicled by the ALJ."  (Resp't's
Mem. of Law (document no. 9-2), at 16.)

In a similar vein are the Commissioner's contentions, on
pages 18 through 20 of his brief, that in April, May, and October
of 2004, Dr. Myers and PA-C Attenborough "did not limit the
number of hours [Redden] could work per day, nor did [they] limit
the number of days [she] could work per week."  (Resp't's Mem. of
Law, at 18-19.)  Neither Myers nor Attenborough said that Redden
could work eight hours per day or could work five days per week,
because neither filled out that part of the Workers' Compensation
Medical Form asking them to list the number of hours per day and
days per week Redden could work.  (Tr. at 279-80, 645.)
Moreover, the Commissioner fails to note that in March of 2004,
Stefanie Diamond, a colleague of Myers and Attenborough at SAP,
did fill out that part of the form, stated that Redden could work
a maximum of four hours per day and three days per week, and made
that determination in conjunction with her finding that Redden
had reached maximum medical improvement.  (Tr. at 270.)  The
Commissioner's review of the record misses the mark and is
unhelpful.  See Sims v. Apfel, 530 U.S. 103, 110-11 (2000).

pain report, also described her as having reached maximum medical improvement.  (See Tr. at 281–82.)  Four months later, Dr. Myers, who also believed that Redden had reached maximum medical improvement, stated that Redden would simply have to live with her pain.

The ALJ's decision also falls short in its consideration of the seven factors listed in 20 C.F.R. § 404.1529(c)(3) and SSR 96–7p.  The Commissioner argues, perhaps correctly, that the ALJ was not obligated to address each of the seven factors, see Crocker v. Astrue, No. 07–220–P–S, 1996 WL 2775980, at *6 (D. Me. June 30, 2008), but needed to deal with "only the ones made pertinent by the record evidence."  But, the ALJ did not meet that standard.

For example, with regard to factor five, "[t]reatment, other than medication, the individual . . . has received for relief of pain," SSR 96–7p, 1996 WL 374186, at *3, the ALJ said only that "the medical evidence of record reveals evidence of an extended history of treatment for neck and shoulder pain" (Tr. at 31), and that between September 11, 2003, and December 31, 2004, "the claimant continued to receive treatment for chronic pain in her neck and shoulders" (Tr. at 32).  Those brief conclusory references do not demonstrate adequate consideration of the

treatment claimant received, the number of different kinds of medical professionals she saw, and the wide range of treatment modalities those medical professionals prescribed.

The ALJ's consideration of factor four, "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain," SSR 96-7p, 1996 WL 374186, at *3, was also insufficient.  The ALJ's decision makes only one reference to medication, and that is to a medication claimant was taking in November of 2006, at the time of her second hearing before the ALJ. (Tr. at 31.)  Thus, the ALJ said nothing about the significant number of different pain medications, and different types of pain medications, that Redden had taken between September 11, 2003, and December 31, 2004.[9]  Redden's medications were certainly made pertinent by the record evidence, given that she was discharged from Osram Sylvania because of the effects the prescribed pain medication had on her.  Yet, the ALJ's decision does not address factor four at all.

While credibility is for the ALJ to determine in the first instance, see Irlanda Ortiz, 955 F.2d at 769, and the requisite

---

[9] The Commissioner argues unpersuasively that the ALJ's mention of Redden's use of Methotextrate in November of 2006 amounted to adequate consideration of claimant's use of medication in 2003 and 2004.

standard of review generally favors affirmance of an ALJ's credibility determination, see 42 U.S.C. § 405(g); Tsarelka, 842 F.2d at 535, the ALJ's credibility determination in this case is not supported by substantial evidence, see Currier, 612 F.2d at 597.  During the relevant time period, claimant was treated for pain by a pain clinic, a physiatrist, a chiropractor, and a physical therapist.  She made nearly 100 visits to those various specialists.  She had also taken either an amount or a combination of prescribed pain medication that caused her to be unfit for her job at Osram Sylvania.  And, she took so much prescribed Darvocet that it affected her liver.  In the face of that record evidence, much of it unaddressed by the ALJ,[10] it is difficult to see how Redden's subjective complaints of pain properly could be deemed "not entirely credible."  But, a valid credibility determination, and a proper RFC assessment, are for an ALJ on remand.


### Conclusion

    For the reasons given, claimant's motion to remand for a new administrative determination (document no. 8) is granted, and the

---

    [10] The ALJ did note that claimant once "receiv[ed] some treatment for episodic abdominal pain/constipation associated with her use of narcotic pain medication," (Tr. at 29), but she did so not in the context of assessing the medication factor of a credibility determination, but in the context of determining that claimant's colitis did not qualify as a severe impairment.

Commissioner's motion to affirm his decision (document no. 9) is denied.  Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is remanded to the ALJ for further proceedings.  The Clerk of the Court shall enter judgement in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

June 9, 2009

cc:  Raymond J. Kelly, Esq.
     Seth R. Aframe, Esq.